Our third case for this morning is Driver v. Marion County Sheriff's Department. The Marion County Sheriff, Mr. Waples. May it please the court, my name is Richard Waples and I represent thousands of detainees who were held for days past the time that they were ordered to be released by courts in Marion County, Indiana. The data in this case are wildly different depending whose brief you're looking at. If you look at the sheriff's brief, they're talking about 61 people. If you look at yours, it's in the tens of thousands. Where are you getting your numbers from? Well, we have, I suppose there's a dispute on the numbers, but certainly there's no dispute that there's enough people for a class certification, which 30 is presumptive enough. But our numbers are... Your numbers. I'm sorry? Where are you getting your numbers? Well, from different... I mean, you know, it's so disparate as... Well, the party's evidence is the defendants have said that they, as soon as they adopted this OMS system in June of 2014, they saw immediate spike up in their prison population, jail population attributed to the changeover in the system. And that they never attempted to quantify what those numbers were. They understood it was because they were backing people up who had court orders to be released, but they weren't being released for two, three, four days. And they never attempted to quantify either the number or the length of those, duration of those over-detentions. So what worries the district judge, as I understand it, is that the reason behind any excessive delay for each person is likely to be different. And actually even the number of people affected by the changeover of computer system over time may be affected. Maybe it was a giant mess at first. It sounds like it probably was. That wouldn't be the only time computer systems have done that to people. But as they get used to the system, as they get the interfaces better, maybe there are fewer people. Maybe there are some people who don't have 72 hours. There's a lot of variation within the group, and I think that was one reason the district judge was stating for refusing to certify as a class. Well, I think that was a subsidiary issue on the first issue of the document where he said that there wasn't predominance because he said that he was looking at the, and took the, which I think was his first era law, and taking the 48-hour presumptive time period from the city of Riverside case, county of Riverside case. I agree with you that that's an extension of Riverside and one that may not be justified. But he makes the predominance point, and it's hard to disentangle this from the change to the OMS system, but I'm having trouble seeing that change as anything but clumsiness. I'm not sure where the malevolent intent is in the changeover of the computer system. We're not claiming that the sheriff intended to back people up by changing over to computer system. The changeover to computer system was a policy decision he made. He's the final policymaker. He made the decision. He said he did. Well, if he didn't intend it, then, and I suppose you're going to down-tick to reckless indifference or something, but I don't even see that. Again, it looks like clumsiness to me. I'll tell you exactly where it is in the record because there's a party dispute on that. They say, oh, no, we vetted this system. We knew, parties agreed that the sheriff knew it was imperative to understand whether OMS would work with the Odyssey system of the courts before they adopted it. His chief deputy said it was necessary. His IT person for years, over 20 years, said it was just common sense. You need to know if they're compatible before you adopt it. But his IT people assured him. Go ahead. Is it possible to truly separate these subclasses specifically? Is it possible to separate out whether a person is detained longer because of the problematic computer systems or because of an alleged 72-hour policy or a combination of the two? Is it really possible? Well, I think that there's going to be some overlap and maybe there shouldn't be subclasses because, and we said as a class as a whole, shared the computer system problem. And, again, getting back to we think it was deliberately indifferent to adopt that computer system knowing that you had to vet it prior, knowing that you needed to know whether it even could understand what the court's system was going to do. They knew for years that the court was moving over Odyssey and that their gym system wasn't compatible. They said, well, here's what we did. We did two things. We did a gap analysis and we got advice from our IT people at Information Services Agency with the city and from the court's IT staff saying, yes, this is a good system. It's compatible and it's going to interface well. And so why does that end up deliberate indifference? But they didn't do that, Judge. But it was my impression reading this that the IT people basically said, we'll bridge this gap for you, basically. We'll find some interface. And it seems to me unjustified to say that the sheriff, I mean, I'm not sure how deep a dive you think the sheriff personally needed to make into the compatibilities of these various computer programs. Well, the sheriff and his people didn't do a dive at all, Judge. They took this computer program because it was free. They knew they had to get a computer program. And instead of going out and doing their due diligence and seeing which one would work, they took this one because it was offered to them for free from GTL, which has a sweetheart deal with the sheriff. It gives them $800,000 a year in order to do the inmate telephone service. And it said, oh, if you extend our contract, we're going to give you this OMS system. And the sheriff said, oh, that sounds good. And I asked him later in deposition, well, did you get what you paid for? And he says, yeah, I think I did, which was nothing. It was worthless. And instead of seeing, there is an ordinance in Indianapolis that's supposed to avoid this very sort of thing. That's what Information Services Agency was created for so that computer programs could be vetted and understand whether they work because they didn't used to do that. Everybody used to get their own computer system. They didn't communicate. And messes like this would happen. So there's an ordinance. The sheriff went outside of that ordinance. I'm sorry? I don't think it's in the record, but has the sheriff ever asked the legislature for money for a new computer system? That's not in the record, and no, I don't think he's asked the state for that. He gets his funding through the city county, and no, he didn't ask for the money because he didn't need the money because it was given to him for free. So I'm going to point out, on page 19 of your opponent's opposition to the 23F appeal, which is what we're using for our briefs, he says, IT staff from the county and the courts were consulted about whether to move to OMS as part of the Odyssey changeover, and no objections were raised. And he goes on to say that the court's IT director, when asked about this, says to the sheriff's staff, if OMS is what you want to go with, you know, we'll figure out a way to send information to you. Now, maybe that was optimistic or whatever, but if that's what the sheriff was told, then why is the sheriff liable for making this choice? Also, Amitav Tamba, who that quote was from, who was the IT staff, said, but, and the sheriff also said before the district court, that we got assurances that they were compatible and that they vetted them. And then when I do the depositions, he said he got it from three people, Amitav Tamba, Geneva Remke, who was his IT person for 20 years and then worked for information services, and Marv Thornsberry, who worked for a contract for information services. I deposed them all. I said, did you ever vet this and determine whether these were compatible? No, I never did. Were you ever asked to? No, I never did. I asked the sheriff, give me any papers that say, any memos, any studies that say, yeah, we vetted this. There is no such memo. There's not even an email saying that it's compatible. Amitav Tamba at the very most said, well, I said, yeah, well if that's what you're going to go with, I guess we're trying to find a way to give it. But he also said right after that quote, but I assumed that they were going through ISA to vet this because that's absolutely imperative if you're going to adopt a computer system that's going to impact on people and their liberty. I mean, this is deliberate indifference. It's kind of like. Well, I mean, but what if Tamba's statement is better understood as just, if you will, a can-do attitude? I don't know what's out there, but whatever problem you throw at me, I'm going to fix it, so don't worry, sheriff. This is my bailiwick. It kind of sounds like that to me. Well, I don't think he said it exactly like that. But still, when there's an ordinance that you go around and you don't vet something and you acknowledge under oath that you knew that you needed to find out if they're compatible before you get it to avoid the very types of problems where people are backed up in jail longer and you go ahead and do it because it's free and you rely at most on the advice, well, if that's what you're going to use, I guess we're trying to find a way to get something to you, which was very qualified. That's not enough. It's like he hired his cousin, who doesn't speak English, to take the orders to the court and surprise them. That's a little unfair to the IT people. Well, it's not, Judge. It's not unfair at all because he got a system for free that couldn't even read the language that the court was sending him, the orders. Can I turn your direction for a second to pattern and practice? Yes. What's your best evidence on pattern and practice? Pattern and practice is this was a decision by a policymaker. No, no, I mean the hard evidence on the 72 hours. On the 72 hours, we have repeatedly all the people. You have a lot of hearsay. Well, it's what our people were told, representations by the people that were holding them. Who in the sheriff's department told them that? Well, a lot of line officers, a lot of other staff. Has any of that been presented to the district court? No, what's been presented is that our people were repeatedly told that when they were held for 72 hours. I'm not questioning that. That may have happened. And it was repeated, and it was told to the district court that the sheriff's chief administrative officer, Louie Deslin, was told that the correctional officers were telling this to people by the jail commander. So, I mean, that's the evidence we have is that there was a practice. Not that it was some written policy that said let's hold everybody for 72 hours, but we had a consistent practice where everybody was held for 72 hours, and when they complained about it, they were told that they were going to be held for 72 hours, and that's how long they had to release them. And when people called, their loved ones called up to the sheriff's department, that's what they were informed as well. The sheriff has, the only evidence they have is one memo that is attributed to the sheriff, not even presented the memo, but Louie Deslin has an affidavit that quotes the memo that was distributed months after we filed the policy. Post litigation, yes, I understand that. So, I mean, there's a disputed issue, but certainly there's enough evidence to give us. Well, there's nothing in the record though, right? I mean, these are the allegations. You have no hard evidence in there. Well, yeah, we do. We have a lot of affidavits from a lot of prisoners and a lot of class members that say that's exactly what they were told, and we have the sworn testimony that that's what correctional officers were telling people, and we have the absolute evidence that that was the practice that was being followed. What we don't have is an admission by the sheriff, yeah, I want to hold people 72 hours, or I don't have a policy that's written that says I want to hold people 72 hours. But I do have a practice, evidence of consistent practice and representations that that was being told. I see I'm over my time. As usual, we don't get to say everything we want to say. Well, you have a little bit of time for rebuttal, so why don't you sit down and we'll call you back. Mr. Overholt. First, Your Honor, I think I want to address Judge Clown's question about the 72 hours. There is no admissible evidence in the record that there exists a 72 hour policy. We have unnamed correctional officers who supposedly said they could be held for 72 hours. No correctional officer has ever been identified. We have the sheriff's written policy that explains that in fact, the 72 hour policy did not exist and was never used. But more importantly, statements by counsel that there's no other evidence about the 72 hours in the record is wrong. His own counsel's own witnesses included two bails, two bail bondsmen. Those two bail bondsmen both said that before the computer system changeover, the release times were not a problem. The people were released timely. That this problem only became an issue at the time of the computer changeover. That supports the notion that in fact, there never was a 72 hour policy. Plaintiff's own witnesses. Does anybody say what timely means? I don't know. They said exactly what timely means, but there was testimony in the record from the current jail commander. That currently releases take approximately nine hours to process. So basically a business day, give or take. Give or take. Yeah. I mean, there were a couple of things that are troublesome. One I'm concerned at the district court's notion that you've got at that end of the process from the release order until the actual release, the same 48 hours that Riverside provides for the detention to arraignment period. And I don't, that's not in the Supreme court's opinion anyway, regardless of what other courts have said. So that bothers me. And the other thing that concerns me is the notion that so many people, what we do know is people are told whether it's true or not, that there's a 72 hour policy is a different question from whether people were told there was a 72 hour policy. And if they were told that in sufficient numbers, then why shouldn't this go forward? Why aren't we really fighting about a merits issue as opposed to a class certification issue? As I'm sorry, as, as to the 48 hour issue, I believe the district court made a reasonable extension of McLaughlin by applying that rule here. Why is that reasonable? Help me. Why should that 48 hour rule apply here at all? Given that McLaughlin address the reasonableness of the time between a judicial determination of probable cause, which one would expect to be significantly longer than the time between court order of a release and the actual release. So I'm not certain that I understand, you know, your reliance on McLaughlin. The district court concluded that in McLaughlin where the Supreme Court talked about the importance of establishing a bright line rule, such a bright line rule should apply equally on the back end of the. But not 48 hours just because we like bright line rules for some reason. There's no reason at all to equate the warrantless arrest to judicial determination time to the time once there's been a further judicial determination that the person should be released for whatever reason, because it was the wrong person, because they made bond, because whatever causes the release. I don't think you can go all the way from, we like bright line rules to say that you can hold somebody for 48 hours after they've been told they're entitled to be at liberty. The district court, I think. Much less 72, I might add. I don't want to try to read the district court's mind, but I think it looked to the 70 or the 48 hour rule in McLaughlin because that is the only test that the parties were aware of where the court set a bright line test in a case similar to this. Well, you know, well, anyway. But it isn't all that similar. That's the point. But ultimately, Your Honor, and the point I want to focus on today is regardless of whether this court agrees that the 48 hour rule from McLaughlin was properly applied, class certification was still properly denied. And that's because, as the district court determined, the rule from Harper and Portis says, reasonableness in this sort of case requires a case-by-case determination, an evaluation of exactly what was going on with that particular inmate, and whether or not in that particular case the release time was too long. So I'm bothered by the lack of... by the sheriff could never form the basis of class certification. Is that your argument? No. I think there could be a set of circumstances, hypothetically, where a system was established that was designed for the purpose of holding inmates, let's say, for example, for 72 hours, regardless of whether that amount of time was necessary or not. That would be delay for delay's sake, which under McLaughlin would be improper. Now, the issue here, though, is with the computer system, as Judge Wood alluded to. We have a situation where the Marion County Sheriff, at the time this system was being put in place, had no internal IT staff. He relied upon the city and the county's IT staff and the courts. The courts were the ones, they were the body that made the decision to move to Odyssey, which required a replacement of the jail management system used by the sheriff. Amitav Thamba, as we talked about earlier, specifically informed the sheriff's office, we'll make this work, that this system, we can do it. The sheriff is entitled to rely upon that, as were the other defendants. Now, the fact that it may have had some problems at the beginning is not in itself deliberate indifference. So here's what I wanted to say a minute ago. What bothers me about this, trying to evaluate whether this was correctly denied or whether perhaps there should have been at least some form of class action, is a very disturbing lack of data. I have no idea, after this computer system was installed and within the time of the proposed class, how many people were let out within eight hours, how many people were let out within 24, 48, 72, and I don't have any notion of whether there's something that would support class treatment. If they're all being let out at 48 on the idea that McLaughlin provides the rule, that's a clean rule of law, up or down, just the kind of thing the Supreme Court looks for in class actions that's either okay or not and might cause the sheriff's office people to kick back and relax because they know they've got 48 hours. But I just feel as though we're doing this in a data vacuum. Judge, you are exactly right. This case has been pending for two years. In two years, the plaintiffs have been wholly unable to determine how long individual inmates were held and even determine who they think was held too long. Well, what discovery requests have tried to get at that? Surely the data is within the sheriff's office. It sure is. They don't have it. And it was provided to the plaintiffs. And the problem is the plaintiffs have been unable to take that data and ascertain who was held for too long. So what? You had inmate 234 and you find out that he was arrested on a certain date and arraigned on a certain date and released and you can't tell when he was? We've given all that data to the plaintiffs and the plaintiffs haven't made any production of how long individual inmates were held. This case has been pending for two years and they failed. They failed to meet their burden. You're absolutely right. Certifying this class makes no sense when the plaintiffs have had two years to determine who's in the class and they've wholly failed to do it. How many people? It's a lot of people per year who go through the sheriff's jail, I assume. Yes. Do you have any ballpark? In terms of numbers of people who go through the jail? Yeah, just extremely generally. I knew at one time 10,000 or 15,000 perhaps. Okay. Yeah, that was sort of my thought. That's not a solid number by any means. So their argument on the computer system is that some sort of airy, oh, don't worry, we'll make it work, isn't adequate basically, that you need a more formal analysis of the two programs, I guess, OMS and Odyssey. You need to figure out if you're hiring people to write entirely new software that will bridge from one system to the other. Is there some easier mechanism to do that? I mean, I know people are hired to do such things, so it's not necessarily straightforward. It is undisputed in the record that the county and the city spent thousands of man hours preparing for the conversion. I would acknowledge, as the district court found, that the changeover did not go as smoothly as everyone wanted. There's no doubt about that. Did it go smoothly at all? I would say based on just anecdotally the information we have, the number of people who were ultimately detained too long must be fairly small because only 61 people provided affidavits to the district court making that specific allegation. And based upon just the number of complaints and the number of issues that arose, we don't think that group was terribly large. So do you have any evidence that the numbers are shrinking? You would think if you implemented the computer program a couple of years ago, there's been some time to debug it or to get the interface working. And they've been working constantly. And, in fact, the interface was constructed and began working, and I don't recall exactly when. Oh, they had some name for that too. I forget. Yes, it's called Dexter. Yeah, right, right. And the interface was put into operation and functioned a few months in. But for a time it was rough. And that system was put in place. We know from the testimony of Geneva Remke, who is one of the IT people for the county, I don't have her quote, I think I put it in my brief, that the programs are fully integrated or at least as integrated as the sheriff and the courts requested them to be. And so, certainly, as soon as this problem arose, everyone worked as hard as they could to fix it. And, again, that surely supports the notion that there is no deliberate indifference in this case. Unless the court has other questions, I have nothing further. No, apparently not. Thank you. Thank you. Mr. Waples. Maybe you can tell me, Mr. Waples, why we don't have more complete data about the range of times that people took to be released. It's true that we were provided data, but it was late in the discovery process when we got the actual data. So you do, in fact, at this point, maybe too late to do anything with it, but you have the raw data about everybody who went through. We believe we do. The case has stayed before the district court. We do have more discovery to do. We have two experts working on it to compare the two databases because there is an entry for every order to release, and there's an entry and a time stamp for every actual release. And so we're going to do that comparison. Is this something that has to be done manually, or can you do this using? No, we can do it computerized. And we're confident it's going to show tens of thousands of people. We did produce early on in the litigation, before we got the data from the defendants. But it's going to produce tens of thousands of people. Because we submitted on class certification a study by Dr. Robert Sandy, who's one of our experts. He's a statistician, former department chair of the Department of Economics at IUPUI in Indianapolis, who looked at the jail population data and took the defendants' assertions that were what the population was and looked at it historically and looked at it in June of 2014 when it immediately spiked up. And we submitted that, and it's a Docket 158 Exhibit GG. And Dr. Sandy concluded just for the last half of 2014, from June to December of 2014, that there were 38,000 extra days in jail spent by the class members because of the change over the computer system. But does that assume that they should have been released instantaneously or within eight hours or within 24 hours? No, that's compared to the practice before the implementation of the OMS. So whatever the standard practice was. And here's what the evidence was about the standard practice before. The two bail bondsmen that Mr. Overholt mentioned, they do bail bonds around the state of Indiana. They say most counties, it's 15 minutes to two hours to release people. Marion County, it's been longer. Royce Cole says, who's their jail commander, said, in Marion County we take two to four hours to release people once we get an order. If we have blowups, there's emergencies, computer outages, it can take up to six hours. But that's the time period that we should operate on in getting people out. And that's why the predominance issue is really not here because the predominant issue is that computer system because it did basically blow up these release times from two to six hours at the most. And I know you can have, as Judge Young said, oh, you can have other factors that go up. Maybe there's an emergency. Maybe there's more people. Maybe you're missing a guy one day or a computer outage. We can account for those. And all those even account with Royce Cole, their own jail commander, saying at most that's going to get them up to six hours. Is your bottom line that the sheriff was just negligent? No, not at all, Judge. Well, if he's intentional, he's just costing himself money, right? He cost himself a lot of money. Right, in the county. You can't believe he intentionally sought to increase the expense. I'll admit to that. I don't think it was an intent to harm these people, but I do think he was aware of substantial risk of harm to these people, and he went ahead and did it recklessly. It's deliberate indifference. He knew that before the installation of the? That's right, and that's what he testified to, and that's what we have in our briefs. He testified. He knew beforehand it was imperative to make sure that they were compatible or you would have the very type of problems that he had, and he said that's why he checked with three people. And then when did he become aware that he had a problem? I understand your point. They knew as early? They changed over June of 2014. They knew they had a problem in 2013. Derek Peterson admitted that they knew that they had a problem. They knew months before the go live date that the systems weren't? No matter what they did, they still couldn't get them talking to each other, and yet they went ahead. They still know they have a problem. Derek Peterson, the sheriff's IT person, has written him a letter saying, hey, we need to move off of this system because it's still delaying people. We need to get the Odyssey's jail management software, which is perfectly integrated and will be seamless, and we will get people out. They know, and the same thing from the judges. The courts have told them the same thing. Get that other system. All right. You need to wrap up now. Well, we appreciate the court hearing this case, and we do believe that there's sufficient evidence that he knew about a substantial risk of harm, much akin to the hiring cases and the failure to train cases. That's why deliberate indifference on that claim. All right. Thank you very much, Mr. Waples. Thank you, Mr. Overholt. The court will take this case.